

**FILED**

AUG - 7 2000

Phil Lombardi, Clerk
U.S. DISTRICT COURT

Case No.

# 00CV0668B (J)

IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF OKLAHOMA

KAREEM LANDELL LOGAN

Petitioner,

-vs-

SAM CALBONE, WARDEN, GREAT PLAINS CORRECTIONAL FACILITY
AND
JAMES SAFFLE, DIRECTOR, OKLAHOMA DEPARTMENT OF CORRECTIONS

Respondents.

PETITIONER KAREEM LANDELL LOGAN'S
BRIEF IN SUPPORT OF
PETITION FOR WRIT OF HABEAS CORPUS

Don Pope   OBA #7218
Don G. Pope & Associates, P.C.
1818 W. Lindsey, Suite A-108
Norman, Oklahoma 73069-4102
Telephone (405) 360-7555
Facsimile (405) 360-6990
Attorney for Petitioner

August 4, 2000





# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................... i

TABLE OF AUTHORITY..................................................................... i

STATEMENT OF FACTS................................................................... 5

PROPOSITION I ........................................................................... 5

> MR. LOGAN WAS DENIED DUE PROCESS OF LAW WHEN THE
> TRIAL COURT FAILED TO SUPPRESS HIS COERCED SELF-
> INCRIMINATING STATEMENT.

PROPOSITION II ........................................................................ 15

> THE COURT'S FAILURE TO GRANT A NEW TRIAL BASED ON
> THE RECANTED TESTIMONY OF WITNESS MCCLENDON
> WAS DENIAL OF DUE PROCESS.

CONCLUSION ........................................................................... 17

## TABLE OF AUTHORITY
## CASE AUTHORITY

Jackson v. Denno, 378 U.S. 368, 376, 84 S. Ct. 1774, 1780, 12 L. Ed.2d 908 (1964).... 5

Schneckloth v. Bustamonte, 412 U.S. 218, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973).... 7

Malloy v. Hogan, 378 U.S. 1, 84 S. Ct. 1489, 12 L. Ed. 2d 854 (1973)......................... 7

Lego v. Twomey, 404 U.S. 477, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972) ...................... 7

Foster v. State, 657 P. 2d 166 (Ok. Crim. App. 1983)................................................... 7

People v. Steger, 16 Cal. 3d 539, 128 Cal. Rptr. 161, 546 P. 2d 665 (1976)................. 7

Haynes v. Washington, 373 U.S. 503, 513, 83 S. Ct. 1336, 10 L. Ed. 2d 513............... 8

Lynumm v. Illinois, 372 U.S. 528, 83 S. Ct. 917, 9 L. Ed. 2d 922 (1963)..................... 9

Arizona v. Fulminante, 499 U.S. 279, 111 S. Ct. 1246, 113 L. Ed. 2d 302 (1991)....... 12,14

Payne v. Arkansas, 356 U.S. 560, 78 S. Ct. 844, 846 2 L. Ed. 2d 975 (1958).............. 12,13

Chapman v. California, 386 U.S. 18, 24, 26, 87 S. Ct. 824, 828-829, 17 L.Ed.2d 705 (1967)...................................................................................................................13

Bruton v. United States, 391 U.S. 123, 139-140, 88 S. Ct. 1620, 20 L.Ed.2d 476 (1968)..14

Townsend v. Sain, 372 U.S. 293, 317, 83 S. Ct. 745, 9 L. Ed. 2d 745 (1963).....................15

Cornell v. Nix, 921 F. 2d 769 @ 771 (8th Cir. 1990)..............................................................15

Mastrian v. McManus, 554 F.2d 813, 822-823 (8th Cir. 1988)...........................................15

Mooney v. Holohan, 294 U.S. 103; 55 S. Ct. 340; 79 L. Ed. 791 (1935)............................15

Sanders v. Sullivan, 863 F.2d 218 (2nd Cir. 1998)...............................................................15

Smith v. Roberts, 115 F. 3d 818 (10th Cir., 1997).................................................................16

### STATUTORY AUTHORITIES

21 O.S. § 701.7....................................................................................................................1

21 O.S. § 652.......................................................................................................................1

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

KAREEM LANDELL LOGAN.,                )
                                       )
        Petitioner,                    )
                                       )
v.                                     )        Case No:
                                       )
SAM CALBONE, Warden Great Plains       )
Correctional Facility, and JAMES SAFFLE, )
Director, Department of Corrections.   )
                                       )
        Respondents.                   )

## BRIEF IN SUPPORT OF
## APPLICATION FOR WRIT OF HABEAS CORPUS

### STATEMENT OF THE CASE

Kareem Landell Logan, was charged by Amended Information, filed April 2, 1997, in Tulsa

County District Court, Case Number CF-97-319, with Count I– Murder in the First Degree with

Malice Aforethought in violation of 21 O.S. §701.7, and Count II– Shooting with Intent to Kill in

violation of 21 O.S. §652, both Counts allegedly committed August 5, 1996.  A preliminary hearing

was held March 24, 1997, before the Honorable Bradford Griffith, Special Judge.  A jury trial was

held on October 13th through the 17th of 1997, before the Honorable Jesse S. Harris, District Judge.

Appellant was represented by Mr. Cliff A. Stark, Attorney at Law, and the State was represented by

Assistant District Attorneys, Larry Edwards and Denise McIntosh.  The jury returned a verdict of

guilty as charged and recommended a sentence of life without parole on Count I and imprisonment

1

for ten (10) years on Count II. (O.R. 114-115). The trial court sentenced Mr. Logan on October 20, 1997 in accordance with the jury's recommendation and ordered that the sentences be served consecutively. From this judgment and sentence, Mr. Logan perfected his appeal to the Oklahoma Court of Criminal Appeals. The Court ruled on his appeal by unpublished decision on May 12, 1999. Mr. Logan elected not to pursue an application for Writ of Certiorari to the United States Supreme Court and said time for such application elapsed August 10, 1999.

### STATEMENT OF FACTS

Marco Johnson and Brandon Payne (members of the Hoover Crips 107 gang), and Juan Brewer (who was not a gang member) went skating together on Sunday, August 4, 1996. (Tr. 367-369, 374, 386) Payne had previously been convicted of a "gun charge." (Tr. 391, 396-398) Johnson had previously been convicted of possession of an illegal drug. (Tr. 408, 410-411, 415, 418)

Around 2:00 a.m. on August 5th, Johnson drove to his father's house to return the car, Brewer followed, and Payne rode with Brewer. (Tr. 371-373,409, 419-421,453-455,467-468) As Johnson reached the front door, gunshots were fired in quick succession from the street. (Tr. 375-376, 421-423,456, 469,476) Johnson fell into the house through the doorway and his father closed the door. (Tr. 456) After Payne was struck in the knee by a bullet, he opened the car door and ran down the driveway toward the back of the house as the gunfire continued. (Tr. 376-378, 3144, 460) Payne jumped the fence and ran to the nearby house of a friend. (Tr. 378)

Brewer moved toward the passenger side of the car, but he was hit by some of the bullets. (Tr. 377, 429) Brewer fell to the ground beside his car and died. (Tr. 427-428, 457-459, 461, 811-812)

2

Payne did not see or hear a vehicle. (Tr. 392) Johnson thought he saw a dark-colored four-door vehicle. (Tr. 423-424, 432) Two witnesses testified that they saw a dark-colored (possibly brown) vehicle (either a four-door or an El Camino) driving by as the shots were fired. (Tr. 470, 478, 881-883, 885) No one could say who was in the car, but one of the witnesses (Michael Armstrong) testified that Mr. Logan was not in the car. (Tr. 386, 388, 431, 884)

Around the time of the shootings, some women saw several armed persons in the street near the home of Kareem Logan's mother. (Tr. 503,506-508,511,519) Earlier that day, they had seen an unfamiliar brown or burgundy four-door car drive through the neighborhood. (Tr. 504-506) Shawna Durant testified that she recognized one of the armed men as Mr. Logan, because he was limping. (Tr. 506-507, 534) The other three people were wearing black, hooded sweatshirts. (Tr. 514) They disappeared behind an abandoned house and returned without any weapons. (Tr. 512-514, 643-644) They later changed clothes and left the area in two vehicles that the women had not seen before. (Tr. 517, 519)

Mr. Logan testified that he was previously affiliated with a Bloods gang called the Rip Boys. (Tr. 920) He left the gang after going through the SHOCK program in prison. (Tr. 921, 940) Mr. Logan previously had some arguments with Shawna Durant and her son who were neighbors. (Tr. 921-923) The son had been painting graffiti and possibly breaking into houses in the area. (Tr. 921-923) Cynthia Thompson confirmed Mr. Logan's testimony that he was staying at her house when the shootings occurred, and he was there all weekend. (Tr. 896-901, 925) Ms. Thompson confirmed that Mr. Logan had previously been injured and still had to use crutches on August 5th. (Tr. 903, 905-906, 925,928) He had been shot in the leg by members of the Red Mob Bloods gang. (Tr. 927)

3

Mr. Logan first learned of the Brewer and Payne shootings when his mother contacted him a couple of days later at Ms. Thompson's house. (Tr. 923-924, 929) Ms. Thompson's house is about twenty minutes away from the house where Mr. Logan's mother lives. (Tr. 925) Mr. Logan had heard that the shootings of Brewer and Payne were gang-related, and he wanted to find out what had happened before he talked with the police. (Tr. 929) He went to several gang members who told him what had happened and who was involved. (Tr. 929-930, 932-933,980981)

Michael McClendon testified that he had a conversation in jail in which Mr. Logan spoke about his involvement in the shootings. (Tr. 816-821, 823-827, 838) McClendon testified in exchange for minimum sentences on two robbery charges and dismissal of a third charge. (Tr. 814-816, 830) McClendon admitted in his testimony that some of his "facts" were contrary to the trial evidence. (Tr. 855, 860) The trial court overruled Mr. Logan's demurrer to the State's evidence, based on McClendon's testimony that Mr. Logan had confessed to him in the jail. (Tr. 863) McClendon subsequently recanted his testimony in an affidavit signed December 28, 1998.   (See Exhibits Attached to Appellant's Motion for a New Trial filed February 3, 1999).   Said affidavits were offered as exhibits in a Motion for New Trial which was denied.

Reginald Hawkins confirmed Mr. Logan's testimony that Mr. Logan never stated to anyone in the jail that he had shot Brewer or Payne. (Tr. 865-866, 874, 936) Mr. Logan had talked with Hawkins about what had occurred at his preliminary hearing and about the police reports supplied to him by his attorney. (Tr. 866-869, 872, 875-877, 937, 939) McClendon's cell was a few feet from the run where Mr. Logan was cutting Mr. Hawkins' hair. (Tr. 938) Mr. Logan never told McClendon who committed the charged offenses. (Tr. 868-869, 939-940) Hawkins said he never heard Mr. Logan have a conversation with McClendon, and Hawkins would have heard any such conversation

4

from his cell. (Tr. 873) Additional facts will be presented as they relate to the propositions of error.

## PROPOSITION I

### MR. LOGAN WAS DENIED DUE PROCESS OF LAW WHEN THE TRIAL COURT FAILED TO SUPPRESS HIS COERCED SELF-INCRIMINATING STATEMENT.

A defendant's statement is admissible only if it is voluntary. The Court held in *Jackson v.*

*Denno, 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908 (1964)* that:

> It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession, without regard for the truth or falsity of the confession.

Because Mr. Logan's statement was coerced and its admission at trial was not harmless beyond a reasonable doubt, Mr. Logan's conviction should be reversed.

During Mr. Logan's jury trial, the court conducted a "Jackson-Denno" hearing outside the presence of the jurors to determine the voluntariness of a Mirandized statement Mr. Logan made to Detectives Makinson and Lewis while Mr. Logan was in custody. (Tr. 686-706) Mr. Logan made self-incriminating statements after the detectives implied that Mr. Logan's mother would be arrested for harboring a fugitive if Mr. Logan did not recite a version of events that was consistent with the detectives' theory of the case. (Tr. 686-706; Defendant's Exhibit 11) Over defense counsel's objection, the trial court ruled that Mr. Logan's statement to Detectives Makinson and Lewis was not coerced. (Tr. 686-706)

Following the in-camera hearing, Lewis testified as to the substance of Mr. Logan's statement. (Tr. 749-766; see also State's Exhibit 11) Lewis claimed that he used no threats or coercion in obtaining the statement. (Tr. 754) Lewis admitted that, prior to making his statement, Mr. Logan showed concern for his mother. (Tr. 755) Lewis said he made no "promises" to Mr. Logan regarding

his mother's possible arrest. (Tr. 756)

Lewis testified that Mr. Logan stated he had a problem with Hoover 107 Crip gang member Brandon Payne. (Tr. 756-757, 765) Several nights prior to August 5, 1996, Payne and some other Crips drove by a convenience store where Mr. Logan was using the pay telephone and "threw up" gang signs to him. (Tr. 757) Mr. Logan did not respond with signs from the Bloods gang, with which he had been affiliated. (Tr. 758) Payne and the others drove through the area a second time and said several times to Mr. Logan, "What's up 'cuz,'" which is a term of disrespect to a Bloods member and a dare to respond. (Tr. 758-759) Mr. Logan responded to Payne with some "street terms." (Tr. 760) Payne pulled out a gun and shot at Mr. Logan. (Tr. 760) Mr. Logan jumped into a car and left the scene. (Tr. 760)

The most damaging portion of the statement, as related by Lewis, was that Mr. Logan went to "Melody's house" and met with other Bloods members. (Tr. 761) Lewis said the purpose of the meeting was "to plan a strategy, if you will, or response to that response. If you want to use [the term], a plan of retaliation.( Tr. 762) Lewis said, "[Mr. Logan] said that since [the Crips] started it, that [the Bloods] were going to have to do something to [the Crips] to show that, basically, they weren't weak or that they weren't punks, something along those lines." (Tr. 762)

Lewis did not say that Mr. Logan confessed to personally shooting Brewer or Payne. (Tr. 762, 766) Lewis said Mr. Logan gave him street names of the persons who were involved, but Lewis was not able to determine who those people were. (Tr. 763) Lewis said Mr. Logan told him "some little dude from Muskogee" shot Brewer, but Lewis did not try to verify this information. (Tr. 764-765)

6

The Court held in *Jackson v. Denno, supra @386* that:

It is now inescapably clear that the Fourteenth Amendment forbids the use of involuntary confessions not only because of the probable unreliability of confessions that are obtained in a manner deemed coercive, but also because of the "strongly felt attitude of our society that important human values are sacrificed where an agency of government, in the course of securing a conviction, wrings a confession out of an accused against his will," *citing Blackburn v. Alabama, 361 U.S. 315, 320-321*

A.    Mr. Logan's statement was coerced.

The ultimate test of the voluntariness of a confession is whether it is the product of an essentially free and unconstrained choice by its maker.  In determining whether the maker's will was overborne, the court must look to the totality of the surrounding circumstances, both the characteristics of the accused and the details of the interrogation. *Schneckloth v. Bustamonte, 412 U.S. 218, 93 S. Ct. 2041, 36 L.Ed. 2d 854 (1973).*  In determining whether a statement is coerced the proper inquiry is whether the confession was free and voluntary, i.e., not extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of improper influence. *Malloy v. Hogan, 378 U.S. 1, 84 S. Ct. 1489, 12 L.Ed. 2d 854 (1973).*  In making this determination, this Court will consider the totality of the circumstances -- which include both the characteristics of the accused and the details of the interrogation. *Schneckloth v. Bustamonte, 412 U.S. 218, 225, 93 S.Ct. 2041, 2047, 36 L. Ed.2d 854 (1973).*  Once the issue is presented, the burden is on the State to prove by a preponderance of the evidence that the statement in question was obtained voluntarily. *Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed. 2d 618 (1972).*  Numerous cases have ruled on issues related to threats whether explicit or implied to file charges against a relative or to release a family member. See *Foster v. State, 657 P.2d 166 (Ok.Crim. App. 1983), People v. Steger, 16 Cal. 3d 539, 128 Cal. Rptr. 161, 546 P.2d 665 (1976)* each turning

7

on nuances of the facts surrounding each case.  Whether the Confession was obtained by coercion or improper inducement can be determined only by an examination of all of the attendant circumstances. *Haynes v. Washington, 373 U.S. 503, 513, 83 S.Ct. 1336, 10 L. Ed. 2d 513.*

During the in-camera hearing, Lewis testified that, after Mr. Logan was arrested, he desired to "talk to" Detective Lewis. (Tr. 687) At that time, Mr. Logan was in custody at the Tulsa Police Department. (Tr. 688) In response, Lewis and Makinson conducted a tape-recorded interview of Mr. Logan at the police department, and the tape was later transcribed. (Tr. 686-698; Defendant's Exhibit 11) Lewis testified that he read a Miranda warning to Mr. Logan at the beginning of the interview, and Mr. Logan signed a Miranda waiver. (Tr. 689, 690; State's Exhibit 51) Lewis said Mr. Logan did not ask for an attorney. (Tr. 690) Awareness of Miranda rights is only "part of the totality of the circumstances to be considered" in determining the voluntariness of a statement.

Both Lewis and Makinson claimed, during the in-camera hearing, that they did not coerce Mr. Logan and did not promise anything in return for his statement. (Tr. 693,699)  In addition, both detectives denied that they implied to Mr. Logan that, if he cooperated in the investigation, the detectives would not arrest his mother for harboring a fugitive. (Tr. 694, 698) Based on the testimony of the two detectives during the in-camera hearing and the trial court's review of the written transcript of the statement, the court overruled defense counsel's objection to the admission of Mr. Logan's statement. (Tr. 704, 705) The court in its ruling laid emphasis on the fact that the decision to put Ms. Logan's mother in jail came at the end of the interview.  (Tr. 705)

A careful review of the transcript of the taped interrogation of Mr. Logan reveals that, at the beginning of the interrogation, both Lewis and Makinson threatened that Mr. Logan's mother would be arrested and prosecuted if Mr. Logan did not confess to his complicity in the charged offense:

8

A: [by Mr. Logan] *Where my...where my mother at, man?*

Q: [by Detective Lewis] She's over there.

A: I thought you said he was fixing to let her go.

Q: She's fixing to go. They're not gonna arrest her, yeah.

A: *Depending on what?*

Q: Well, let me tell you this, Kareem. *You know that they could arrest her.*

A: Yeah, I mean, yeah.

Q: I mean, you know, *but the deal is nobody wants your mama.* And if you didn't do this, nobody wants you, O.K.?

A: Yeah.

Q: Now, what I'm saying is *here's your opportunity to say what happened.* (Defendant's

Exhibit 11, Pages 2 & 3; emphasis added)

The above excerpt from the transcript of Mr. Logan's statement to the detectives demonstrates that Detective Lewis threatened that if Mr. Logan didn't confess, *"they could arrest"* Mr. Logan's mother. (Defendant's Exhibit 11, Page 2 - emphasis added). It is significant that this comment was made at the beginning of the interrogation and while the phraseology of the statements could be construed as ambiguous the implication is clear that if things didn't go the way the detective's wanted  Mr. Logan's mother was at risk of arrest.  In response to this threat, Mr. Logan made self-incriminating statements. (See Defendant's Exhibit 11, Pages 3-23). In *Lynumn v. Illinois, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed. 2d 922 (1963)* the Supreme Court held invalid a statement made by the defendant when the officers, during the course of her arrest, implied that her minor children would be taken away from her if she were arrested and failed to cooperate with police.

9

After Mr. Logan made his statement the following dialogue between the detectives and Mr.

Logan then transpired:

Q: [by Detective Lewis] So the night before, though, you were willing to go ...
you willing to go put in some work at Corky's, you was.

A: [by Mr. Logan] Yeah, I, I mean, tell you like that, man, you know what I'm saying,
(inaudible) disrespecting me, you know what I'm saying, so whenever I see him, (inaudible)
still gonna have to look at it, so, shit, man.

Q: O.K.

Q: [by Detective] (Makinson) *We might as well go ahead and put his mother in
jail* (inaudible).

A: Yeah, go ahead, man. She, she, she'll be all right. *Shit. She...it ain't like
she gonna stay in there very long.*

Q: (Makinson) *Well, she will when she gets convicted.*

A: I mean, I mean, oh well, that's, that's...

Q: (Makinson) She will when she gets convicted.

A: I feel like that (inaudible).

Q: (Makinson) Yeah, she can bond out. You won't be able to. She'll be able to,
*but she'll be... she'll get (inaudible) when she gets convicted.*

A: Convicted for what?

Q: (Makinson) For harboring a fugitive.

A: *For real?.*

Q: (Makinson) *Yeah, yeah, for real. Yeah.*

A: *So you all gonna take my momma to jail?*

Q: (Makinson) *Yeah. Yeah, because you're not shooting straight with us, Kareem, and*

10

*that.., that story of you're gonna shoot straight with us bullshit, I knew that... I knew I wasn 't buying it.*

A:  Yeah.

Q:  (Makinson) *But, you know, hey, it's up to you, and you've made your decision.* That's fine with me.

Q:  It's your case.

Q:  (Makinson) *Yeah. Yeah, put her in jail, put him in jail, and we'll be on with it.*

A:  All right, fuck (inaudible).

Q:  All right (inaudible).

A:  Take me to my...(END OF TAPE)

(Defendant's Exhibit 11, Pages 23, 24; emphasis added)

The above excerpt from the transcript of Mr. Logan's interrogation clearly shows there was an expectation of the officers that Mr. Logan was to give a satisfactory statement (as judged by the detectives) and the consequences of his failure to do so would result in his mother's arrest.   The above clearly shows that the perceived lack of cooperation by Mr. Logan was what resulted in the decision to place his mother in jail.   The detectives' intentional and coercive tactic of threatening arrest and prosecution of Mr. Logan's mother for harboring of a fugitive rendered involuntary Mr. Logan's incriminating statements.   The statement therefore should have been suppressed by the trial court following the in-camera hearing, and Detective Lewis should not have been allowed to testify before the jury as to its content. (Tr. 749-766). In addition, the voluntariness of the statement should not have been submitted to the jury. (See O.R. 105)

11

In *Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed. 2d 302 (1991)*, the reversal of a murder conviction was upheld by the United States Supreme Court, based on improper admission of an involuntary confession. Fulminante was receiving rough treatment from other inmates because he was "an alleged child murderer." Id. at 286, 111 S.Ct. at 1252. Fulminante confessed in exchange for a promise of protection. The United States Supreme Court agreed with the Arizona court that the confession was elicited by mental coercion. *Id. at 287, 111 S.Ct. at 1252-1253*. Like the defendant in Fulminante, Mr. Logan was subjected to mental coercion based on his desire to protect his mother from going to prison.

In *Payne v. Arkansas, 356 U.S. 560, 78 S.Ct. 844, 846 2 L.Ed.2d 975 (1958)*, a nineteen-year-old was convicted of murder and sentenced to death. The young man was arrested without a warrant, not advised of his rights to remain silent and to have counsel, held incommunicado for three days, denied food for long periods of time, and was finally threatened that a mob might do violence to him unless he confessed. *Id. at 567, 78 S.Ct. at 849-850*. Two of the young man's brothers and three of his nephews were jailed and questioned. *Id. at 563, 78 S.Ct. at 848*. When defense counsel moved to suppress the confession, the court held a pre-trial hearing in chambers and eventually instructed the jurors that they could disregard the confession if they found it was not voluntary. *Id. at 566, 78 S.Ct. at 849*. The jury returned a general verdict of guilty. Id. The United States Supreme Court ruled:

> That petitioner was not physically tortured affords no answer to the question whether the confession was coerced, for there is torture of the mind as well as body; the will is as much affected by fear as by force .... [U]se of the confession before the jury, over petitioner's objection, deprived him of that fundamental fairness essential to the very concept of justice, and, hence, denied him due process of law, guaranteed by the Fourteenth Amendment.

*Payne*, 356 U.S. at 566-567, 78 S.Ct. 849-850 (citations omitted).

Mr. Logan's case is parallel with Payne in many respects. Mr. Logan is a very young man –
only twenty-three years of age. (Tr. 919) His sentence of life imprisonment without possibility of
parole forfeits the whole of his life. Even though he was advised of his rights, he was threatened with
the prosecution of his mother if he did not confess to the satisfaction of the detectives. The pre-trial
hearing, jury instruction, and general verdict occurred by the same procedure as in Payne. In Mr.
Logan's case, as in Payne, the incriminating statement was induced by mental coercion.

Although Mr. Logan initiated the discussion concerning his mother during the interrogation,
Detectives Lewis and Makinson quickly turned Mr. Logan's concern to their advantage and
effectively coerced him into making an involuntary inculpatory statement. Additionally, the use of
his mother's arrest status shows the detectives intent with the accused.   The State thus failed to
establish at the in-camera hearing that Mr. Logan's statement was voluntary by a preponderance of
the evidence, based on the totality of the circumstances. See *Chapman v. California, 386 U.S. 18,
24, 26, 87 S.Ct. 824, 828-829, 17 L.Ed.2d 705 (1967).*

> B.   The trial court's error in admitting Mr. Logan's coerced statement was not
> harmless beyond a reasonable doubt.

In *Fulminante*, while four of the Justices would have ruled that the harmless-error rule did
not apply, the majority of the United States Supreme Court abandoned that position. *Id. at 288, 111
S.Ct. at 1253.* The Court adopted the position that the due process violation of admitting a coerced
confession would be subject to harmless error analysis and would have to be found harmless beyond
a reasonable doubt in order to reverse the Arizona court. *Id. at 295, 111*

The State of Arizona failed to uphold its burden of showing that admission of the coerced confession did not contribute to the conviction. *Fulminante, 499 U.S. at 296-300, 111 S.Ct. at 1257-1260.* The majority reasoned:

> A confession is like no other evidence. Indeed, "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him... Certainly confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so."

*Fulminante, 499 U.S. at 296, 111 S.Ct. at 1257, quoting Bruton v. United States, 391 U.S. 123, 139-140, 88 S.Ct. 1620, 1630, 20 L.Ed.2d 476 (1968).*

In Mr. Logan's ease, the jury bore the "profound impact" of Lewis' testimony that – without any threats, promises, or other coercion – Mr. Logan implicated himself in the retaliatory shooting of Brewer. (Tr. 749-766) Because the Crips gang shot at Mr. Logan, Mr. Logan met with the other Bloods and planned the retaliation. Such evidence, which goes to the central question of intended death for the victim, cannot be harmless beyond a reasonable doubt. *Fulminante, 499 U.S. at 307-308, 111 S.Ct. at 1264.* Detective Lewis' testimony prejudiced the jury and doomed Mr. Logan to conviction of murder and shooting with intent to kill with imprisonment from the time of his sentencing at age twenty-three to the time of his death. Mr. Logan has been denied due process of law. Appellant submits that the State cannot meet its burden of showing that this denial was harmless beyond a reasonable doubt, and Mr. Logan's convictions should be reversed. U.S. Const. amend. V, XIV..

14

**PROPOSITION II: THE COURT'S FAILURE TO GRANT A NEW TRIAL BASED ON THE RECANTED TESTIMONY OF WITNESS MCCLENDON WAS DENIAL OF DUE PROCESS**

Subsequent to Petitioner's trial witness Michael McClendon recanted the testimony given at trial in affidavits which were attached to Petitioner's Motion for New Trial (See attached copies of Affidavits submitted to the Court of Criminal Appeals, Exhibit "A" and "B"). Petitioner's motion for a new trial on the basis of this recanted testimony was denied by the Court of Criminal Appeals in it's decision dated May 12, 1999 for the reason that it was not timely filed.

Newly discovered evidence relevant to the constitutionality of a state prisoner's detention is a ground for federal habeas relief. *Townsend v. Sain, 372 U.S. 293, 317, 83 S.Ct. 745, 9 L.Ed. 2d 745 (1963).* Habeas relief should be granted based on newly discovered evidence if the evidence would probably produce an acquittal on retrial. *Cornell v. Nix, 921 F.2d 769 @ 771 (8th Circ. 1990).* A state's failure to cure conviction after credible recantation of material testimony violates due process if recantation "would most likely affect the verdict". *Mastrian v. McManus, 554 F.2d 813, 822-823 (8th Circ. 1988).*

In reviewing a case due to recanted testimony the Tenth Circuit has traditionally adhered to the rule that was established by the Supreme Court in 1935. "The guides for decision are clear. If a state, whether by the active conduct or the connivance of the prosecution, obtains a conviction through the use of perjured testimony, it violates civilized standards for the trial of guilt or innocence and thereby deprives an accused of liberty without due process of law." *Mooney v. Holohan, 294 U.S. 103; 55 S. Ct. 340; 79 L. Ed. 791 (1935).* Petitioner urges that the standard set out in *Sanders v. Sullivan, 863 F.2d 218 (2nd Circ., 1988)* is the more reasoned approach. *Sanders* sets out a three-prong test for evaluating whether the State denied due process by not granting a new trial after

15

learning of the credible recantation post-trial.  It held a due process violation would occur "when a credible recantation of the testimony in question would most likely change the outcome of the trial and a state leaves the conviction in place." *Id at 222.*  The Tenth Circuit distinguished the standard in *Smith v. Roberts 115 F.3d 818 (10th Circ., 1997)*, however, left the door open to further consideration when it held that "while this inconsistency (In Smith) could well have been a valuable impeachment tool, we are not faced with the situation in which a witness recants the testimony that *names the defendant as the perpetrator of the crime."* n2 ... In view of our conclusion that the circumstances here do not present the compelling situation upon which the court grounded its ruling in *Sanders,* we conclude this is not the case to revisit *Wild* and *McBride* as urged by Mr. Smith. *(Id, 820),* (Emphasis added).

Mr. McClendon's affidavits state that he was coerced by the State's counsel to testify against Mr. Logan, and that he gave false testimony.  McClendon testified that he had conversations with Mr. Logan and overheard Mr. Logan talking to another prisoner in the jail.  (Tr. 817-829) These statements go into substantial detail about Mr. Logan's involvement with the crime.  The testimony of Michael McClendon was definitely material and there is a reasonable probability that without McClendon's false testimony that the result of the trial would have been different.  McClendon's testimony clearly stated Logan was the perpetrator of the crime as he supposedly reiterated Logan's own statements.  While the State may not have used these statements knowing them to be false they certainly acknowledged the value of this information by offering Mr. McClendon the minimum sentence available to him.

16

## CONCLUSION

Petitioner's conviction was obtained by use of a coerced confession and was supported by false statements, later recanted, by a material witness. For these reasons Petitioner should be granted habeas relief and the matter remanded for a new trial.

Respectfully submitted,

Don Pope   OBA #7218
Don G. Pope & Associates, P.C.
1818 W. Lindsey, Suite A-108
Norman, Oklahoma 73069-4102
Telephone (405) 360-7555
Attorney for Petitioner

## CERTIFICATE OF MAILING

I, Don G. Pope, hereby certify that a true and correct copy of the foregoing Brief in Support of Application for Writ of Habeas Corpus was mailed, postage prepaid on the ___8th___ day of August, 2000, to :

Attorney General
112 State Capitol
Oklahoma City, OK 73105

Director James Saffle
Oklahoma Department of Corrections
3400 Martin Luther King
Oklahoma City, OK 73136

Warden Sam Calbone
Great Plains Correctional Facility
P.O. Box 200
Hinton, OK 73047

Don G. Pope

17

COUNTY OF PITTSBURG )
                                   ) ss:

STATE OF OKLAHOMA )

## AFFIDAVIT

I, MICHAEL McCLENDON, being of legal age and upon my oath, do solemnly state:

I am acquainted with KAREEM LANDELL LOGAN, who was convicted of First-Degree Murder in Oklahoma County Case Number CF-97-319, and was sentenced on October 20, 1997, and who has filed an appeal with the Court of Criminal Appeals in Case Number F-97-1458.

I have the following personal knowledge that is relevant to Mr. Logan's case and was not presented at his trial: MY TESTIMONY WAS BASED ON ASSUMPTION & HERESAY. AT THE TIMES THE ALLEGED FELONIES WERE BEING COMMITTED BY MR. LOGAN I WAS IN THE OKLA DEPT. OF CORRECTIONS, NOT AT THE CRIME SCENE. MY TESTIMONY WAS SECOND HAND AT THE LEAST, FALSE AT THE WORST. I WAITED AND AT THE TIME BELIEVED MY TESTIMONY TO BE TRUE. NOW I BELIEVE DIFFERENT AND WITH GOD PRINCIPLE & MORAL WISH TO WITHDRAW MY TESTIMONY WITHOUT PERJURY CHARGES, FOR I THOUGHT IN MY MIND WHAT I HEARD WAS TRUE. OBVIOUSLY NO FAULT IS MINES BECAUSE THE D.A. KNEW FOR A FACT I WASN'T A WITNESS TO THE ACTUAL CRIMES, YET I WAS COACHED INTO THE POSITION OF A MATERIAL WITNESS

I have attached the following items in support of my statement: _____
_____

I am willing to appear in court and testify under oath to the above information. Further, affiant saith not.

*Michael McClendon*
*michael McClendon*
(signature - in presence of notary)

**EXHIBIT**
**A**

*michael McClendon*
(print name)
*P.O. Box 97*
*McAlester, OK 74502*
(address)

Subscribed and sworn to me on this the _11_ day of _____ JAN _____, 1999.

*Joy Rice*
NOTARY PUBLIC

My commission expires:
_7-26-2002_
(SEAL)

**RECEIVED**

JAN 2 1 1999

OIDS
APPELLATE DIVISION

COUNTY OF PITTSBURG )
) ss:
STATE OF OKLAHOMA )

### AFFIDAVIT

I, MICHAEL McCLENDON, being of legal age and upon my oath, do solemnly state:

I am acquainted with KAREEM LANDELL LOGAN, who was convicted of First-Degree Murder in Oklahoma County Case Number CF-97-319, and was sentenced on October 20, 1997, and who has filed an appeal with the Court of Criminal Appeals in Case Number F-97-1458.

I have the following personal knowledge that is relevant to Mr. Logan's case and was not presented at his trial:

IN EXCHANGE FOR A SENTENCE REDUCTION, I WAS COERCED BY TULSA COUNTY DISTRICT ATTORNIES OFFICE to TESTIFY AGAINST KAREEM DURING HIS FIRST DEGREE MURDER CASE the testimony WAS FALSE, Completely.

I have attached the following items in support of my statement: _____

I am willing to appear in court and testify under oath to the above information. Further, affiant saith not.

Michael McClen
(signature - in presence of notary)

Michael McClendon
(print name)
Po Box 97
McAlester, Ok 74502
(address)

EXHIBIT
B

Subscribed and sworn to me on this the 28 day of ___ DEC ___, 1995.

Joy Rice
NOTARY PUBLIC

My commission expires:
7-25-2002
(SEAL)

RECEIVED 12-8-99